INTERNATIONAL SHOE CO. *v.* HARRISON.

Apr. 6, 1953

No. 38710 26 Adv. S. 8 63 So. 2d 837

*Wallace & Greaves,* for appellant.

*Morse & Morse* and *Eaton & Cottrell,* for appellee.

KYLE, J.

Mrs. Ruth N. Harrison, plaintiff in the court below, recovered a judgment in the circuit court of Harrison County against the International Shoe Company, a corporation, and Ernest L. Minchew, defendants, in an action for damages for personal injuries alleged to have been sustained by the plaintiff while riding in an automobile owned by the International Shoe Company and operated by Ernest L. Minchew, its employee. And from that judgment the International Shoe Company prosecutes this appeal.

The record shows that the International Shoe Company is a nonresident corporation engaged in the business of manufacturing and selling at wholesale men and boys shoes, and that its principal offices are located in the City of St. Louis, Missouri. At the time of the accident complained of in the plaintiff's declaration Ernest L. Minchew was employed as a salesman for the shoe company, and the territory assigned to him included the territory bordering upon the Mississippi Gulf Coast and the City of Mobile, Alabama. Minchew had been employed in that capacity for a period of approximately one and one-half years at the time the plaintiff was injured. He was furnished an automobile for use by him while engaged in the performance of his duties, and he

was paid for his services a commission on the sales made by him. Additional allowances were made to him to cover his traveling expenses, including expenses incurred in the operation, maintenance and repair of the automobile used by him which was owned by the company. The automobile which he was using at the time of the accident complained of in the plaintiff's declaration was a 1950 model 4-door Chevrolet sedan. The back seat of the automobile had been removed for the purpose of making room for sample trays of shoes, which the salesman carried with him for display to prospective customers.

At the time the automobile was delivered to Minchew written instructions were given to him covering the uses to be made by him of the automobile. Minchew was required to acknowledge receipt of the instructions and to agree in writing to be governed by the instructions. The instructions expressly provided that ''Under no circumstances are you to loan the car to anyone, neither are you to use it yourself for other than company business. You are not to use same to convey passengers except customers on company business * * *. The company has assigned the car to you for company uses and purposes, and it is your responsibility to see that it is used in that manner only. * * * Do not use the company car for personal use.''

The plaintiff alleged in her declaration that the accident which resulted in her injuries occurred on October 14, 1951; that Minchew at that time was in possession of the automobile and was using the same in and about the business of his employer; that the plaintiff was riding with Minchew on the front seat of the automobile as a guest and invitee of the defendant, International Shoe Company; and that while she was a passenger in the automobile, as a guest and invitee, Minchew recklessly, carelessly and negligently drove the automobile into and against the rear end of another automobile proceeding along the highway in the same direction. The plaintiff,

in the second count of her declaration, alleged negligence on the part of the defendants in the loading of the automobile with trays of shoes stored in the back seat space in such manner that, if the automobile came to a sudden stop, the trays would shift forward and crush a person riding on the front seat, and the plaintiff alleged that the negligent storing of the shoes in the back seat space proximately contributed to the plaintiff's injuries.

The defendant, International Shoe Company, in its answer denied all of the material allegations of the plaintiff's declaration, and denied in particular that Minchew at the time of the accident which resulted in the plaintiff's injuries, was engaged in the discharge of any duty of his employment by the defendant or in the furtherance of the defendant's business. Minchew, who was named as a codefendant, interposed no defense to the plaintiff's action.

The plaintiff's case rests almost entirely upon the testimony of Minchew, who was called by the plaintiff to testify as an adverse witness, and her own testimony.

Minchew testified that he arrived at the Friendship House on the outskirts of the City of Gulfport about 9:30 p. m. on Saturday, October 13, 1951, and checked into one of the cottages; that he wrote up his orders and his expense account, as he was accustomed to do, and put them in an envelope; and that he then had supper in the Friendship House restaurant, where the plaintiff was employed as a waitress. While he was having his evening meal Minchew asked the plaintiff if she would like for him to take her home. The plaintiff accepted his offer, and Minchew and the plaintiff left the Friendship House about 11 o'clock to drive to the plaintiff's home in Long Beach, which was several miles west of Gulfport. Minchew testified that he told the plaintiff when she got into the automobile with him that he had orders that should be mailed to the home office that night, and he requested the plaintiff to remind him to mail them.

Minchew testified further that, after leaving the Friendship House, he and the plaintiff decided that they would attend a floor show at "Gus Stevens," a night spot located several miles east of the City of Gulfport; and with this in mind they drove to the plaintiff's home in Long Beach, where the plaintiff could change her wearing apparel. The plaintiff, who was divorced from her husband, had two children, a daughter 11 years of age, and a son, 10 years of age, who resided with her in Long Beach. When she arrived at her home in Long Beach she learned that her daughter had not returned from a moving picture show, that she was attending in Gulfport. The plaintiff changed her wearing apparel and she and Minchew then drove back to Gulfport to pick up her daughter. The child was not at the Paramount Theatre. The plaintiff and Minchew then drove to the Gulf View Theatre, where they found the child; and they took the child back to the plaintiff's home in Long Beach.

The plaintiff and Minchew then left the plaintiff's home in the automobile driven by Minchew and drove to the "Gus Stevens" place near the corporate limits of the City of Biloxi, a distance of approximately 12 miles, arriving there about 12:30 a. m. They remained there approximately 45 minutes and saw the floor show. They then drove to another night spot a short distance west of the "Gus Stevens" place on U. S. Highway No. 90 known as the "Paddock Club." The record is not clear as to the length of time they spent at the "Paddock Club." But they left the "Paddock Club" in Minchew's car about 2:30 a. m. and were traveling westwardly on the "Back Road" through the Handsboro community toward the plaintiff's home in Long Beach, when the accident occurred in which the plaintiff sustained her injuries.

The testimony shows that Minchew's automobile was running at a rate of speed approximately fifty or fifty-five miles per hour when it collided with an old Buick automobile which was being driven by Issac Jessie (col-

ored). Jessie had left Ocean Springs at an early hour in the morning for the purpose of carrying two colored girls to their work in the City of Gulfport. Jessie's automobile was running at a rate of speed of about thirty miles per hour. Minchew's automobile struck the rear end of the Buick and both cars were badly damaged. The plaintiff, who was riding on the front seat of Minchew's car, was thrown forward into the windshield, and was severely injured. Her injuries included a deep cut across the face, which required expert surgical treatment, and which left scars that had not been removed at the time of the trial.

The defendant introduced in evidence the memorandum agreement, containing the instructions covering the uses and manner of operation of a company-owned car, which Minchew had been required to sign at the time the company-owned car was delivered to him, and also a statement which Minchew had signed a short time after the accident, and in which he had certified that at the time of the accident he was using the company-owned automobile for his own personal use and benefit, and that he was not on company business of any kind.

The main point argued by the appellant's attorneys as grounds for reversal of the judgment of the lower court is that the court erred in refusing to grant the peremptory instruction requested by the appellant at the conclusion of the testimony.

We think that the peremptory instruction should have been granted. It is clear from Minchew's testimony and the testimony of the plaintiff that at the time of the accident Minchew was not engaged in his employer's business, and that the tortious act complained of in the plaintiff's declaration was committed outside the scope of Minchew's employment. It is clear from Minchew's own testimony that, if Minchew intended when he left the Friendship House at 11 p. m. to drive to the post office in Gulfport and mail his orders to the company, he aban-

doned that intention for a time at least immediately thereafter, when he and the plaintiff decided to visit the night spots on the outskirts of the City of Biloxi and see a floor show at "Gus Stevens" place. And it is not a matter of importance that, when the plaintiff got in the car with him, Minchew told her to remind him to mail his orders. That was the only item of business that Minchew had to attend to for his employer. And yet the testimony shows that he passed through the City of Gulfport three times during the next two hours without mailing the orders. Minchew testified that he forgot to mail the orders while he was in Gulfport. When questioned more closely about the matter, he stated that he wanted to go to the office and pick up his week-end mail, "and I did not want to do that when Mrs. Harrison was in the car, and I was going to wait until she got out."

When Minchew left the plaintiff's home in Long Beach at 12 o'clock midnight to drive to the "Gus Stevens" place and later to the "Paddock Club" for a night of entertainment, he had disengaged himself entirely from the business of his employer. He was engaged in a mission that was purely personal to himself, and was using the appellant's car in violation of the instructions given to him by the appellant.

The general rule relating to the liability of the employer for the tortious act of the employee when committed outside the scope of his employment is stated in 35 Am. Jur., p. 989, Master and Servant, par. 555, as follows:

"The general rule is that if an employee who is delegated to perform certain work for his employer steps or turns aside from his master's work or business to serve some purpose of his own, not connected with the employer's business, or, as it is often expressed, deviates or departs from his work to accomplish some purpose of his own not connected with his employment—goes on a 'frolic of his own'—the relation of master and servant is thereby temporarily suspended, and the master is not liable for

his acts during the period of such suspension; he is then acting upon his own volition, obeying his own will, not as a servant, but as an independent person, even though he intends to and does return to his employer's business after he has accomplished the purpose of his detour from duty. The test of the employer's liability for the act of an employee who departs from the employer's business for purposes of his own is whether he was engaged in his employer's business at the time of the accident, and not whether he purposed to resume it. The employee is, so long as he is engaged in affairs of his own or in pursuing some purpose unrelated to his master's business, acting as much outside the scope of his employment as he would be were his working day ended, or his task completed, and thus his employer is relieved from liability for the consequence of any tortious conduct committed by the employee during that period, however short it may be.''

''An employer who furnishes an employee with an automobile for his use in expediting the employer's business is not liable for injuries resulting from the employee's negligence in the use of the machine for his own purposes, not connected with the master's business, as such use of the automobile is not within the scope of the agent's employment.'' 5 Am. Jur., p. 717, Automobiles, par. 378. See Annotations: 22 A. L. R. 1397, 1419; 45 A. L. R. 477, 490; 68 A. L. R. 1051, 1056; 80 A. L. R. 725, 730; 122 A. L. R. 858, 876.

This Court has recognized the rule stated above in several cases.

In the case of Shell Petroleum Corporation, et al. v. Kennedy, 167 Miss. 305, 141 So. 335, the oil company's city manager at Meridian was driving with his wife in a company-owned automobile to another town to see about a loan for a prospective purchaser of a gasoline service station, which, if procured, might have resulted in the purchase by the borrower of the gasoline service station and the sale of gasoline and other petroleum products by

the oil company to the borrower. While the oil company's city manager was on his trip, the automobile that he was driving collided with the appellee's automobile. Kennedy, the appellee, sued the oil company and Houston, the oil company's city manager, for damages for personal injuries. In reversing a judgment against the oil company, the Court held that the oil company's city manager was not acting within the apparent line of his duties or in the course of his employment, so as to render the oil company liable for the injuries to the appellee resulting from the collision between the appellee's automobile and the oil company's automobile driven by its city manager. The Court in its opinion stated that the oil company's city manager was taking a pleasure drive for the benefit of his wife; that the trip that he made was voluntary, and was wholly without and not apparently within the course of his employment; and that the claim that if the oil company's city manager had been able to help the prospective purchaser of the gasoline service station procure a loan it might have inured to the benefit of the oil company, was too fanciful to constitute a legal basis of liability against the oil company for the injuries sustained by the appellee.

In the case of Bourgeois v. School Supply Co., 170 Miss. 310, 155 So. 209, the Court held that, where a truck driver employed to deliver the truck owner's merchandise drove the truck to his home for lunch, and on his way back departed from the direct route to the truck owner's warehouse to call for another of the truck owner's employees, the truck driver was not engaged in his master's business so as to render the truck owner liable for personal injuries and property damage sustained by the plaintiff, when the truck, while on its way to such other employee's home, collided with the plaintiff's automobile.

In the case of Stovall v. Jepsen, 195 Miss. 115, 13 So. 2d 229, the Court held that █ where a servant steps aside from his master's business for some purpose of his own,

disconnected from his employment, the master and servant relationship is temporarily suspended and the master is not liable for his acts during such time. The Court in its opinion in that case said: "It is undisputed, as argued on behalf of appellee, that the fact that Pierce was a servant of the defendant and was using the defendant's car on the night of the accident, made out a prima facie case that he was serving the defendant in all he did. However, the evidence without any substantial conflict met the prima facie case and overcame it. It showed that when Pierce turned around and faced north and went up to the scene of the accident he was not serving his master but himself alone. His duties to his master required him to go in the opposite direction in order to deliver the papers."

In the case of Kramer Service, Inc. v. Robinson, et al., 201 Miss. 805, 29 So. 2d 456, the Court held that where a truck driver had gone thirty miles beyond his territory in which lay his duty and authority and was traveling in the opposite direction therefrom at the time of the collision resulting in the death of the plaintiff's intestate due to the driver's negligence, the driver was not acting within the scope of his employment and the truck owner could not be held liable for his negligence. The Court in its opinion in that case said: "It is further shown, without any conflict, that Martin had no authority to be at this place at this time in the discharge of any duty as employee of Kramer, and if he were there he was on a private mission of his own. He had entirely abandoned his master's business and was far from the scene of his duties."

The appellee's attorneys cite in support of their contention that Minchew, at the time of the accident complained of, was acting within the scope of his employment and in furtherance of the appellant's business the cases of Barmore v. Vicksburg, S. & P. Ry. Co., 85 Miss. 426, 38 So. 210; Primos v. Gulfport Laundry & Cleaning

Co., 157 Miss. 770, 128 So. 507; Southern Bell Telephone & Telegraph Co. v. Quick, 167 Miss. 438, 149 So. 107; and Delta Cotton Oil Co. v. Elliott, 179 Miss. 200, 172 So. 737.

The appellee's attorneys made specific reference to the statement in the Court's opinion in the Barmore case that, "If the act which the servant was engaged in, at the time of the injury, was one which, if continued until its completion, would have furthered the master's business and been within the scope of the servant's employment, the master would be liable, even though the act occurred at a place to which his duty did not necessarily call him." But the appellee's attorneys overlook the very important fact that, at the time the plaintiff was injured, Watson, the railroad company's employee, had resumed his duties as such employee. And the Court, after mentioning that fact, said: "When did Watson resume his service, so as to render his master liable? His private affair was to carry a sick friend to the station, but when that was completed and he began to propel the railroad tricycle back over the route which he had previously traveled, with the intention and for the purpose of proceeding to the discharge of the duty which he was employed to perform, he then resumed his master's service, which had been suspended temporarily while he was engaged about his own affairs."

It is clear from the statement which we have quoted that the rule applied in the Barmore case cannot help the appellee in this case. Minchew's private affair was to take the appellee to her home in Long Beach, so that she could change her clothes, and then to take her to "Gus Stevens" to see the floor show, and finally to take her back to her home in Long Beach after the night of entertainment was over. That program of personal activities had not been completed at the time the accident occurred, and Minchew, unlike Watson in the Barmore case, had not resumed his master's service at the time the appellee was injured. In the Barmore case Watson had deviated

from his line of duty to carry a sick friend to the station. That was only a minor deviation, a temporary departure from the service of his master. And yet the Court was of the opinion that the master's responsibility was suspended during the interval that elapsed while Watson was engaged in the performance of that humanitarian service.

Neither can the rule laid down in the Primos case, supra, be invoked to establish liability against the appellant in the case that we have here. In the Primos case, File, the employee, testified that his purpose in going to the dance was to solicit business for the laundry; and the Court held that, if File attended the dance in part for the pleasure of himself and his wife, and in part to solicit business for the laundry, he was acting within the scope of his employment. But in this case none of Minchew's movements after he and the appellee had decided to attend the floor show at "Gus Stevens" were actuated by any purpose of serving his employer.

In the case of Southern Bell Telephone & Telegraph Company v. Quick, supra, the proof showed that Stewart was employed by the telephone company as a "trouble shooter," and on the day the accident occurred was engaged in repairing wires attached to one of the company's poles. He completed the repairs at 1:20 p. m., and from his place on the telephone pole, he called the office of the telephone company by telephone and reported the completion of the work about which he was engaged, and was then told by his superior, Johnson, who had the right to control his movements and order him to do any particular work, to "go get his lunch and report to the plant for the purpose of relieving him (Johnson) at the board." Upon receiving the order, Stewart descended from the telephone pole, placed his tools and equipment in the automobile, and drove it toward his residence for the purpose of getting his lunch before returning to the company's warehouse, his purpose being to avoid walking

and to save time. The collision occurred while Stewart was en route to his home to get lunch. The Court held that the question whether or not Stewart was engaged in the master's business at the time of the accident was a question of fact to be determined by the jury.

In the case of Delta Cotton Oil Company v. Elliott, supra, the record showed that Trammel was the appellant's bookkeeper and that it was his duty to secure bills of lading for the appellant from the railroad companies. About 10:30 o'clock on the night of the accident Trammel, who was driving a company-owned automobile, appeared at the Illinois Central Railroad Company freight depot and obtained from the night clerk a bill of lading for a carload shipment of cottonseed products. The accident in which the appellee was injured occurred a few minutes later on a street about two blocks from the house where Trammel and Hendry, the appellant's assistant manager, were rooming. The Court held that it was a question for the jury as to whether Trammel was serving himself or serving the oil company at the time the collision occurred.

It can be readily seen that the decisions rendered in the Southern Bell Telephone Company case and the Delta Cotton Oil Company case have no particular bearing upon the question that we have presented on this appeal.

The appellee's attorneys contend, however, that Minchew's testimony that he had in his car at the time of the accident orders which he intended to mail to the home office of the shoe company in St. Louis after he got back to Gulfport that night created an issue of fact as to whether Minchew was acting within the scope of his employment and was engaged in the furtherance of his employer's business, which was properly submitted to the jury. But there is no substantial conflict in the testimony, and, in our opinion, the evidence clearly shows that Minchew was not engaged in the discharge of the duties of his employment at the time the accident oc-

curred. There is nothing in the record to justify the claim that Minchew, when he left the "Paddock Club" at 2:30 a. m. to take the appellee back to her home in Long Beach, was actuated to any appreciable extent by a purpose of serving his employer. And the fact that the orders which he expected to mail, when he left the Friendship House at 11 o'clock, were still lying on the front seat of his automobile at the time the accident occurred three hours later only confirms what the testimony as a whole shows, that Minchew, after leaving the Friendship House, had turned aside completely from his employer's business for purposes of his own and had not reëngaged himself in his employer's service at the time the accident occurred. It is clear from Minchew's testimony that he had no intention of mailing the orders until after he had taken the appellee back to her home in Long Beach.

Minchew's testimony was in part as follows:

"Q. How long did you remain at the Paddock?

"A. I don't know what time we left there, we talked with friends we met there.

"Q. And you and Mrs. Harrison got in the car and on your way to Long Beach when the accident happened?

"A. Yes, sir.

"Q. The accident occurred on what is known as the Back Road?

"A. Yes, sir.

"Q. Which is about a mile or a mile and a half north of the Gulf of Mexico?

"A. Yes, sir.

"Q. You know that Highway 90 skirts the Gulf?

"A. Yes, sir.

"Q. And the road to the north is the Pass or the Back Road?

"A. Yes, sir.

"Q. And that is the road you were on?

"A. Yes, sir.

"Q. You were not engaged in any business at the time for the International Shoe Company?

"A. I had no business, I had to come to Gulfport to mail my letters.

"Q. You had been to Gulfport before that?

"A. Yes, sir, and I forgot to mail them.

"Q. And that was all that you had for the Company, were those orders?

"A. Yes, sir; and I wanted to go to the office and pick up my week-end mail, and I did not want to do that when Mrs. Harrison was in the car, and I was going to wait until she got out.

"Q. Your main objective at the time was to take Mrs. Harrison home?

"A. Yes, sir.

"Q. And after you landed her safely in Long Beach, you expected to mail the letters?

"A. Yes, sir.

"Q. And pick up your mail?

"A. Yes, sir.

"Q. That was going to be done after you delivered Mrs. Harrison to her home safely?

"A. Yes, sir."

In the case of S. & W. Construction Co. v. Bugge, 194 Miss. 822, 13 So. 2d 645, the appellants were contractors engaged in the construction of an ordnance plant near the Town of Flora. Ellis was employed by them as cost clerk. Ellis lived in an adjoining county and owned his own automobile, which he used in going to and returning from his work. When Ellis quit work on Saturday afternoon, he carried home with him certain reports and papers belonging to his employers for the purpose of completing the compilations. On Monday morning, while Ellis was returning to his work at the ordnance plant in his automobile, having with him the reports and papers belonging to his employers, he ran over and seriously

injured the appellee. The appellee sued Ellis and the contractors in the chancery court for damages on account of the alleged injury. The chancellor held that Ellis, at the time the appellee was injured, was acting within the scope of his employment and in furtherance of the business of his employers, and that the contractors were liable as joint tort-feasors; and the chancellor rendered a decree in favor of the complainant against Ellis and the contractors. This Court on appeal reversed the decree of the chancellor and held that there was no legal liability on the part of the contractors. In its opinion the Court stated that Ellis, at the time of the appellee's injury, was serving his own purpose of transporting himself to the place where his work for the day was to begin. The Court, in referring to the papers which Ellis had in his possession at the time of the accident, said: ''There is no substantial foundation in the facts of this case to sustain a suggestion that the alleged servant would have taken any other course either as to time, manner or place, than he did had the papers mentioned not been in his possession.'' The Court held that the proof in the case was insufficient to sustain the contention that Ellis ''was actuated to any appreciable extent in making the trip and in the manner which he did by the fact that these papers were to be returned that same morning as a collaterally incidental part of his return trip—a trip which he would have made for himself, papers or no papers.''

In the case of Hunter v. First State Bank, 181 Ark. 907, 28 S. W. 2d 712, the Court said: ''The test of the owner's liability for the negligence of his employee in injuring the property or person of third persons while driving the former's automobile is the nature of its use at the time of the accident,—whether or not it is being used in the transaction of the business of the owner of the automobile. The very basis of the rule of respondeat superior, as applied to automobile accidents as well as other cases, is that the driver of the car is acting for the owner, and

not for himself personally, at the time of the accident. When the servant steps outside of the master's business and enters upon the performance of some individual purpose of his own, he ceases to act as the servant of the owner, and the latter's responsibility for his acts terminates.''

During the 2½ hours that elapsed from the time that Minchew left the appellee's home in Long Beach, in company with the appellee, to drive to ''Gus Stevens'' place for the purpose of seeing a floor show, until the car that he was driving collided with Isaac Jessie's old Buick on the Back Road, about 2:30 a. m., Minchew was not engaged in the discharge of any of the duties of his employment as a shoe salesman; and there is no evidence that Minchew attended to any business for the shoe company during that time, or that he attempted to attend to any business for the shoe company during that time. According to his own testimony, the only business that he had to attend to for the shoe company at that time was to mail his orders to the home office in St. Louis, and he forgot to do that. This is not a case in which there was a mingling of the personal purpose of the employee with the doing of the master's work, as in the Primos case, or in which there was a short deviation from duty followed by a prompt resumption of the master's service, as in the Barmore case. Here we have a complete turning aside from the master's service.

''Before a master is responsible for the torts of his servant, the servant must not only be acting in the course of his employment, or within the scope of his authority, but must be actually engaged in his employer's business at the time of the injury. P. F. Collier & Son Distributing Corporation v. Drinkwater (C. C. A. 4th), 81 F. 2d 200, 204; Martin v. Greensboro-Fayetteville Bus Line, 197 N. C. 720, 150 S. E. 501; 3 C. J. S., Agency, 187.'' White v. Firestone Tire & Rubber Co. (C. C. A. 4th), 90 F. 2d 637, 639.

 We think that there was no legal liability on the part of the appellant for the injuries complained of, and for the reasons stated above the judgment of the lower court is reversed and judgment is entered here for the appellant.

Reversed and judgment rendered for the appellant.

*McGehee, C. J.,* and *Holmes, Ethridge,* and *Lotterhos, JJ.,* concur.