391 So.2d 990 (1980)
SEEDKEM SOUTH, INC. a/k/a Tenatek, Inc.
v.
Gary G. LEE.
No. 51841.
Supreme Court of Mississippi.
December 10, 1980.
*991 Frank W. Hunger, Lake, Tindall, Hunger & Thackston, Greenville, for appellant.
Wayne O. Lee, Gaines S. Dyer, Dyer, Dyer & Dyer, Greenville, for appellee.
Before SMITH, BROOM and COFER, JJ.
SMITH, Presiding Justice, for the Court:
Seedkem South, Inc. appeals from a judgment in favor of Gary G. Lee for $2,934.52 rendered against it by the County Court, and affirmed by the Circuit Court, of Washington County. Lee's suit was brought originally against Seedkem and one Sanchez, an employee, and was for the recovery of damages to Lee's automobile alleged to have resulted from a collision between Lee's car, driven by him, and a bob truck leased by Seedkem and being driven by Sanchez. It was alleged that the collision and resulting damages were the results of negligence upon the part of Sanchez in the operation of the truck and that Seedkem was liable under the doctrine of respondeat superior.
Before the trial began plaintiff effected a settlement with Sanchez and he went out of the case as a party.
By agreement, the case was heard before the county court judge without the intervention of a jury. At the conclusion of the evidence, the trial judge applied the comparative negligence statute, holding that both Sanchez and Lee had been guilty of negligence which proximately contributed to the collision; that Sanchez was, at the time, acting within the scope of his employment by Seedkem and was about the business of Seedkem and that Seedkem, therefore, was liable to Lee.
There was no substantial conflict in the evidence with respect to the material issues.
Plaintiff Lee, in addition to his own eye-witness testimony, offered these witnesses on the issue of liability: Mississippi Highway Patrolman Williams, Greenville Police Officer Wages and Sanchez. Sanchez testified for the plaintiff, Lee, (the record shows an an "adverse" witness). In substance, Sanchez said that he had delivered the truck to National Car Rentals in Greenville, from whom Seedkem had leased it, for servicing in keeping with instructions from Seedkem, that he had waited until the truck had been serviced. The servicing of the truck was completed at about 3:00 in the afternoon. Sanchez then called Seedkem, whose place of business was near Lake Providence, Louisiana, and talked to a fellow employee. He instructed this employee to have him checked out at 4:30 p.m. and told him that afterward he would not return immediately to Louisiana but would visit with relatives in Greenville.
On cross-examination, Sanchez admitted that his statement that he was going to visit relatives in Greenville was "a complete fabrication and falsehood." He testified that in reality what he intended to do was to go and have some drinks. He said that he left National Car Rentals at about 3:00 in the afternoon and drove the truck to a place known as the Riverdale Club where he stayed about three hours drinking beer and shooting pool. From there he drove to another similar establishment known as *992 "B's" where he stayed until about midnight and continued his beer drinking.
Sanchez testified that the reason he made a false report to Seedkem by telephone was that he knew that Seedkem had a "strict policy against drinking on the job." He said that his instructions had been that when he returned to his home at Lake Providence to take the vehicle to his home and keep it there until he reported for work on Monday morning. There is no testimony that he had permission to use the truck for personal business or pleasure.
The account of the collision itself given by Sanchez was to the effect that, at about midnight, after some nine hours of beer drinking and pool playing, he decided to leave B's and started back toward Louisiana on Highway 82. After going two or three miles, he had developed a headache (not surprisingly) and said that he intended to return to B's, the place he had just left, in order to get an aspirin. On leaving B's, he had proceeded only two or three miles in a westerly direction on Highway 82. Highway 82 is a four-lane highway and Sanchez turned south across the median for the purpose of entering the east bound lane of the highway. In order to return to B's it was necessary that he proceed east to the next interchange and turn north and then west. He stated that he "was going to make a left turn at the median there," and said that it was then that the collision occurred. He said that prior thereto he saw no vehicles to his rear and insisted that only one car was involved in the collision. He said he was slowing down to make a left turn, that he was on the inside lane next to the median.
On cross-examination, Sanchez admitted, as he had testified on a previous occasion, that his instructions had been that he was to have the truck serviced, go back home and park it there at his house. He admitted that he understood from his instructions that after the truck was serviced he was to bring it "right back" to his house in Louisiana and that he understood his instructions were to take the truck right on back to his house in Louisiana after it was serviced in Greenville.
The collision occurred at the intersection of Highway 82 and Cypress Lane Road, at the City of Greenville. It was investigated by Mississippi Highway Patrolman Williams. Williams testified for plaintiff. He said that two other vehicles had been involved in the collision with the vehicle driven by Sanchez. Although the evidence is incontrovertible that this was true, Sanchez denied it throughout his testimony. He stated that the damage to the truck had been to the left front tire, bumper and fender. Patrolman Williams said that Sanchez was drunk, (Sanchez had said that he didn't "think" that he was). Patrolman Williams said that his conclusion was based upon the fact that "He (Sanchez) was unsteady on his feet, from the way he was talking, he was blushed around the face, his eyes were red and I could also smell alcohol-not only on him but on his clothes also." He testified that plaintiff Lee told him at the scene that as he approached "travelling east toward Greenville" that he had seen the Sanchez truck "on the right shoulder of the road ... headed east toward Greenville." As he (plaintiff Lee), approached Sanchez's vehicle it began to pull to its left, out on the road, and he, plaintiff Lee, switched lanes. As he switched lanes Sanchez's vehicle hit him. The other truck involved, was being driven by one McGee. Patrolman Williams said "-I talked to him (McGee) and he said he saw the first accident and was going to try to go around and that is when the other truck hit him-where the bob truck hit him."
Patrolman Williams testified, without objection, that in his investigation that he had learned that just prior to the accident the bob truck had been parked off the right hand side of the road, facing Greenville and that the two pickups which collided with it, were also headed toward Greenville. He testified that plaintiff Lee had told him that as he (Lee) approached it (Sanchez truck) pulled out into the highway and as it did he (Lee) switched to the left lane, and in the process of switching to the left lane it was at that point in which the vehicles collided. Patrolman Williams said that *993 when he arrived at the scene, none of the vehicles had been moved, the front of the bob truck was headed east.
Patrolman Williams testified "There were three vehicles involved, one vehicle being a bob truck (Sanchez) belonging to National Car Rentals and two pickup trucks involved. One of the pickup trucks was off in a barpit on the right side of the road which would be the east bound lane and was overturned." Patrolman Williams took photographs of the scene which appear to support his testimony. These photographs indicated that the first vehicle and the bob truck collided in the right hand east bound lane and the second at about the center line of the east bound lane, the bob truck (Sanchez) coming to rest in the median.
Greenville City Police Officer Dyer also went to the scene and testified for plaintiff. He said that "The man (Sanchez) was unsteady on his feet; he wasn't falling down drunk or anything of that nature, but he was unsteady on his feet and in my opinion should not have been operating a motor vehicle." When Dyer was asked if he (Sanchez) was drunk or sober he answered "Drunk. Too much to be driving." He stated that he noticed nothing abnormal about the drivers of the other vehicles.
Plaintiff Lee, testifying in his own behalf as an eyewitness, said:
He (Sanchez) was coming off the shoulder of the road and I was in the right hand lane, the eastbound lane-he had done come across that part, so I went to the left hand lane trying to get around him-there wasn't no way I could stop it happened so fast and he was coming across the lane and I hit him.
He also testified that "It looked like he (Sanchez) was drunk-he was trying to direct traffic and they arrested him." He testified that when he first saw the bob truck it was located on the right shoulder of the highway headed east. He said he first noticed the truck on the shoulder of the highway when it began pulling out into his lane of traffic. Plaintiff Lee testified further:
A. He (Sanchez) pulled off the shoulder-see, I was in the right hand lane and he pulled off the shoulder into the right hand lane, so I went to the left hand lane-it was still the eastbound traffic lane-to try to get around him.
Q. Where was your truck and the bob truck located with reference to the two lanes when the impact occurred?
A. In the center of the left hand eastbound lane.
The trial judge delivered an opinion in which he stated a number of conclusions, including the following:
Sanchez was at various times about the business of his principal acting as agent and at other times had deviated from his agency relationship and was engaged in certain personal activities. For example, the time he spent at the Riverdale Lounge was a deviation from his agency relationship-it was his personal pursuit. The time that he spent at "B's" place was a deviation from his agency relationship and was his personal pursuit. Earlier he had the truck serviced which was in the service of his principal. During those periods of time when he was moving that truck in the direction of Lake Providence, Louisiana, between the episodes of his drinking in these lounges or beer joints he was, nevertheless, in the service of his principal... . [A]lthough he in some respects violated rules of his principal or master he, nevertheless, had a common understanding as to sufficient latitute (sic) about his taking care of the truck; ... Now, at the precise moment when the accident took place was he in a deviation from the agency relationship or was he on his master's business-his principal's business? There is substantial testimony that he was making a "U" turn at the time. This "U" turn would have taken him from a generaly (sic) easterly direction toward a generally westerly direction or toward the Mississippi River bridge and presumably to Arkansas and Louisiana on the other side. In other words, back home-back to the place of his principal's place of business... . Whatever his intent was in his fairly intocicated *994 (sic) state his actions were to divert this truck from a direction away from Louisiana in a "U" turn to go toward Louisiana where it was his duty to return the truck... . Finally, the Court concludes that at the time of the impact with the plaintiff's vehicle Mr. Roy Sanchez was indeed and in fact acting as the agent of his principal at that precise moment Seedkem South a/k/a Tenatek, Inc. This is not to say this was not an interesting itenerary (sic). It is almost as if to say that if he had had a collision with someone while driving into one of these beer joints in the driveway, he would have been in a period of deviation. If he had hit somebody while driving out of the beer joint toward Louisiana, he would have been resuming his employment. Notwithstanding the difficulties of the exact sequence of times and moments of time, the Court has concluded that which the Court has found here. So much for the agency relationship.
.....
(R. 106).
The trial court made it clear in its opinion that Sanchez's activities during the nine hour beer drinking spree had indeed constituted a deviation from the scope of his employment by Seedkem. The court noticed, however, that Sanchez had left B's and had driven two or three miles in a westerly direction on Highway 82 toward Louisiana before he made a decision to return to B's for an "aspirin." On making that decision, Sanchez had made a U-turn left, entering the east bound lane on Highway 82 and had proceeded along Highway 82 in an easterly direction toward Greenville. It was Sanchez's further purpose or intention (in his secret mind) to make another U-turn and, that completed and the median crossed, to turn back west and proceed for a couple of miles in order to return to B's. Apparently it is only assumed that, having gone back to B's and taken his aspirin, Sanchez, at some unspecified future time, would again leave B's and again start back in the direction of Louisiana. It is clear from the eye-witness testimony of plaintiff Lee that only the first act which can be construed as having been consistent with this projected procedure had been performed, when Sanchez, from a parked position on the right shoulder of the east bound lane, reentered the highway from the right, into the path of plaintiff Lee who himself was travelling in the right hand east bound lane and it is there that the collision occurred, all vehicles "pointed toward Greenville."
We have found no case in which the facts were comparable to the undisputed facts in this case. An examination of the authorities would indicate that each case has been decided on the basis of its own peculiar facts and circumstances. The plaintiff, Gary Lee, testified in his own behalf as an eye-witness to all of the facts and circumstances immediately prior to, at the time of and following the collision. He is bound by his own testimony. He stated unequivocally that when he observed the truck operated by Sanchez it was parked on the right shoulder of the east bound lane headed toward Greenville and that the collision occurred when it pulled into his lane, which was the right hand east bound lane of the highway, and that he tried to go around the truck, but was unable to do so.
We think the conclusion of the trial court that Sanchez was making a U-turn "at the time" is contrary to the testimony of the plaintiff as an eye-witness. Sanchez had made a U-turn but it was to travel east. The trial court said that when and if the second U-turn had been completed Sanchez would have then been headed back to his principal place of business in Louisiana, if he had turned west to go to B's. Sanchez did say that it was his purpose to make another turn and go back west to B's. Actually, the testimony of Sanchez was that he purposed to make a U-turn in order to go back to B's for an aspirin. There can be no question that all of the vehicles were headed easterly toward Greenville at the time of the collision. The plaintiff is bound by his own eye-witness testimony that this was a fact. The same thing applies to Sanchez's statement that he was in the left *995 lane when the plaintiff testified positively that Sanchez was on the right shoulder of the east bound lane, that he, plaintiff, was in the right hand east bound lane, and that it was when Sanchez turned left into the right hand east bound lane that the collision occurred.
The trial court said: "Whatever his intent was in his fairly intoxicated state his actions were to divert this truck from a direction away from Louisiana in a "U" turn to go toward Louisiana where it was his duty to return the truck." Actually, of course, Sanchez only said that he was returning to B's for an aspirin.
No one can know what Sanchez, in his intoxicated condition, had intended to do if the collision had not occurred. It is clear from the record that Sanchez remembers little about it. He even denies colliding with two automobiles, although it is an incontrovertible fact that he did. In any event whatever he intended to do eventually, it was only something he "intended" to do but had not done. As a matter of fact, it is quite likely that throughout the nine-hour drinking spree he "intended" at some time or other to return home to Louisiana.
We have concluded that the correct rule in cases of this kind with regard to the liability of employer for tortious acts of his employee is correctly stated in 35 Am.Jur., p. 989, Master and Servant, par. 555, which this Court quoted with approval in International Shoe Co. v. Harrison, 217 Miss. 152, 63 So.2d 837 (1953):
"The general rule is that if an employee who is delegated to perform certain work for his employer steps or turns aside from his master's work or business to serve some purpose of his own, not connected with the employer's business, or, as it is often expressed, deviates or departs from his work to accomplish some purpose of his own not connected with his employment-goes on a `frolic of his own'-the relation of master and servant is thereby temporarily suspended, and the master is not liable for his acts during the period of such suspension; he is then acting upon his own volition, obeying his own will, not as a servant, but as an independent person, even though he intends to and does return to his employer's business after he has accomplished the purpose of his detour from duty. The test of the employer's liability for the act of an employee who departs from the employer's business for purposes of his own is whether he was engaged in his employer's business at the time of the accident, and not whether he purposed to resume it. The employee is, so long as he is engaged in affairs of his own or in pursuing some purpose unrelated to his master's business, acting as much outside the scope of his employment as he would be were his working day ended, or his task completed, and thus his employer is relieved from liability for the consequence of any tortious conduct committed by the employee during that period, however short it may be." (Emphasis added).
Applying the above rule to the particular facts of the present case, we have reached the conclusion that under the testimony offered by plaintiff, including his own eye-witness testimony by which he is bound, the deviation having been established, no such return to duty had taken place as would place the acts of Sanchez as having been performed within the scope of his employment by Seedkem so as to render Seedkem liable therefor under the doctrine of respondeat superior. The case will be reversed and a judgment will be entered here for Seedkem.
REVERSED AND JUDGMENT ENTERED HERE FOR SEEDKEM.
ROBERTSON, P.J., and SUGG, WALKER, BROOM and COFER, JJ., concur.
BOWLING, J., PATTERSON, C.J., and LEE, J., dissent.
SUGG, Justice, specially concurring:
I specially concur in the majority opinion. Sanchez admitted he was told to drive the truck directly from Greenville, Mississippi to Lake Providence, Louisiana immediately after the truck was serviced in Greenville. On cross-examination the following appears in the record:

*996 Q. The fact of the matter is that Mr. Vining told you did he not to get the truck serviced in Greenville and bring it right on back to Louisiana. That is correct is it not?
A. He said keep the truck at home over the weekend.
Q. But he told you after you got it serviced to bring it right on back didn't he?
A. He didn't say right on back-he said just come on back and I'll see you Monday morning.
Q. But he said after it was serviced to come on back-he said that didn't he Mr. Sanchez?
A. I assume-I guess he did. I don't know.
Q. Well, earlier you gave me a deposition in this case and I asked you that very question, if Mr. Vining didn't tell you to get the truck serviced and bring it right on back and you said yes, didn't you?
MR. DYER:
If the Court please, I would like him to refer to the deposition page and answer to the question.
THE COURT:
The Court will pretermit its ruling pending the predicate that may be laid.
Q. Mr. Sanchez, do you remember giving me a deposition-when you came to my office and I asked you some questions?
A. I remember, yes.
Q. Do you remember me asking you as to whether Mr. Vining said when you get the truck serviced you were to come on back and park it at your house?
A. Yes, I remember that.
Q. Now, I'm handing you your deposition-at the bottom of page 22 starting at line 17 I asked you "Did he not tell you to bring it back and park it just after you got it serviced?" You said, "No, he didn't say that." I said, "What did he say then?" Your answer was, "He said when I get the truck serviced, you know, just come on back home and park it there at the house." My next question was, "So it's your testimony that he said when you get the truck serviced come on back and park it at your house." You answered, "Yes." My next question says, "Didn't you understand from that that after the truck was serviced you were to bring it right back to your house in Louisiana?" Your answer was, "Say what now?" Then I said, "Didn't you understand after you talked to Mr. Vining that after the truck was serviced here in Greenville you were to leave the National Car Rental people and take the truck right on back to your house in Louisiana?" Your answer was, "Yes, I guess so." Then I asked again, "I'm sorry I didn't understand you." You said, "I said yes." So, it is correct is it not that you understood that after you talked with Mr. Vining that immediately after the truck was serviced you were to take it right on back to Louisiana?
A. Yes.
Q. And that is your testimony today?
A. Yes, sir.
John Bertram, a witness for Seedkem, testified that he had a conversation with Sanchez on the afternoon of May 27, 1978 and, with reference to the conversation, stated:
A. Well, he was over here in Greenville somewhere when I talked to him and he said he was-he was supposed to have serviced the truck over here which he did, and he said he was through and it would take him about two hours to get back home-that he was going to stop by his brother-in-law's or cousin or something for a few minutes, and then would proceed to his house, and told me to go ahead and give him the two hours it takes to get from our warehouse to here and clock him out.
Sanchez was directed to drive the truck directly from Greenville to Lake Providence immediately after it was serviced, and according to Sanchez's statement to Bertram, the truck could have been driven from Greenville to Lake Providence in about two hours. Sanchez deviated from the directions given him by his employer and the accident occurred during the deviation.
WALKER, J., joins in this opinion.
*997 BOWLING, Justice, dissenting:
I dissent.
Under our system of jurisprudence certain entities have the duty, responsibility, prerogative and right to make findings of fact in disputed litigation issues. That duty and right is never in this Court unless it can be said with reasonable certainty that the first obligor was manifestly wrong. In this case, the trial was had before the County Judge in Washington County sitting without a jury. His findings of fact were held to be correct in the appeal to the circuit court. With deference, the majority opinion consists in a large part of findings of fact, some of which are unsupported by the record.
As indicated in the majority opinion, the basic issues in the case revolve around whether or not the driver of appellant's truck was engaged in a deviation from his duty as an employee or had abandoned a deviation and resumed what he was obligated to do under his employment.
It is undisputed that appellant's driver was instructed to make three deliveries in Arkansas on Saturday morning, after which he was to take the truck to Greenville, Mississippi, for repairs. He was then specifically instructed to take his employer's truck home for safe-keeping over the weekend and return it to the employer's place of business on Monday morning. There is only one route from Lake Providence, Louisiana, to and from Greenville, Mississippi, and that is Highway 82 which consists of a bridge over the Mississippi River. It is undisputed that the admitted deviations to the two "night spots" were along this sole and direct route back to Arkansas.
It is undisputed that appellant's driver deviated on the route back to his home where he was to store the truck [at no specific time] when he deviated two times to enter two nights clubs for the purpose of beers and pool. It is undisputed that he left the second night club and headed in a westerly direction toward the Mississippi River and Arkansas. It is undisputed that because of a severe headache he decided to return to the last night spot and secure either BC's or aspirins, there being no other place to purchase such going westerly. Contrary to the implications of the majority opinion, the driver stated positively, and as obviously believed by the trier of fact, that he was not going to get another beer or engage in any other activity. The trier of fact believed him even though the majority here does not. With all due deference, it is obvious that the fact that appellant's driver had been drinking has greatly influenced the writer of the majority opinion, and certainly unjustifiably in this instance. I respectfully submit that the statute and case laws regulating situations such as that before us were designed to protect the traveling citizens from inebriated drivers as well as those who are cold sober. The majority opinion quotes excerpts from the opinion of the county judge. Parts not quoted include the following:
Actions taken in other words to further the purpose of taking this truck back home where from the totality of circumstances the court concludes that the established employer-employee relationship permitted him to keep this vehicle overnight or during weekends, there being no evidence here that there was any objection to that arrangement on the part of the employer. Notwithstanding the areas of seeming contradiction as to the timeliness of his return of the truck, the court concludes that he had the truck in his possession with his principal's approval until the following Monday morning. He was not obligated to take it back to the employer's place of business when he got back to Lake Providence ...
Suffice it to say that there was no restrictions previously imposed that would prevent his having access to the truck, provided that he ultimately brought it back to Lake Providence, Louisiana.
The lower court then found as a fact that the driver was engaged in making a "U-turn" to resume his westerly travel on his direct route when the collision occurred. The court stated:
To narrow this down, however, we must look to the question of what is the effect *998 of his assertion that he had a headache, and that he was going to make this "U" turn in order to go back to what is inferred here as "B's" Lounge although there seems to be some difficulty of recollection by the witness Mr. Sanchez as to the exact name of this place. He was prompted about that and the court concludes that it was a place called "B's" place that he was headed to. He asserted that he was going to get an aspirin or BC powder to deal with his headache. He rejected the notion that he might have done that over across the bridge in Arkansas because he didn't know of any place that was open. He knew that "B's" was open and that is where he was headed. It may be significant that he did not assert in his testimony that he needed to go back to Greenville and get this aspirin or this BC. He was making a "U" turn, thus turning his vehicle in a westerly direction headed toward Louisiana if that notion is correct. The court concludes that in this sense whatever may have been the reason for his headache, and we have no medical testimony-no expert testimony here-as to what may have induced the headache although we do know about the drinking, the court would only be speculating to surmise the reason for the headache, if, indeed, his purpose was to reduce the impact of that headache it can reasonably be concluded that his purpose was to be able to drive his vehicle better to go in whatever direction he was going. This would not be unlike the operation of an airconditioner in the face to wake the driver of a truck up so that he could better drive the truck. Even if that be in error, actions sometime speak louder than words.
The majority opinion quotes from the testimony of appellee, Gary G. Lee, in justifying the writer's opinion that appellant's driver was not attempting to make a U-turn as found factually by the trier of fact. He only quotes Lee as testifying that the driver was coming off the shoulder of the road and was in the righthand lane and made no reference to what appellant's driver was attempting to do when observed by Lee. With all due deference, the writer of the majority opinion is misleading in discussing Lee's testimony. On page 68 of the record, appellee testified as follows:
Q. What, if anything, unusual happened on the route home?
A. There was a white bob truck on the right hand side of the road making a "U" turn. When I got upon him he was making a "U" turn and I tried to go around him. I couldn't get around him and my truck caught the front of his truck and tore the side up and I slid sideways down into the ditch and turned over.
On page 85 of the record, we find the following testimony from appellee Lee:
Q. When you first saw the bob truck, tell the Judge where it was located?
A. On the shoulder of the highway.
Q. Off the right hand shoulder of the highway?
A. Yes, sir.
Q. Was it stopped?
A. I don't know if it was stopped-the first time I noticed him he was on the shoulder of the highway starting to make a "U" turn.
It is abundantly clear, therefore that in order to reverse the trier of fact on his finding that appellant's driver was attempting a "U" turn at the time of the collision, the above testimony would have to be entirely ignored. The majority opinion attempts to confine Lee's testimony, and, with deference, this just cannot be done with the above positive testimony. The majority opinion states that "Lee is bound by his own testimony." We would go further and say that this Court is bound by the lower court finding the above quoted testimony to be true. How can the majority say that the trial court's finding regarding the "U" turn is contrary to the testimony of appellee as an eyewitness in the face of the above quoted testimony?
In addition to the finding of fact regarding the ending of the deviation by appellant's driver, it is undisputed, abundantly *999 clear, and without any doubt, that the driver was doing exactly what he was instructed to do. He was taking appellant's truck home to safeguard it over the weekend and return it to the place of business on Monday morning.
The leading case on the question of deviation of an employee is Barmore v. Vicksburg, Shreveport and Pacific Railway Co., 85 Miss. 426, 38 So. 210 (1904). This Court said:
The master is responsible for the negligent acts or omissions of his servants in the course of their employment, though unauthorized or even forbidden by him and although outside of their "line of duty," and without regard to their motives ...
In determining whether a particular act is committed by a servant within the scope of his employment, the decisive question is not whether the servant was acting in accordance with the instructions of the master, but, was he at the time doing any act in furtherance of the master's business? If a servant, having completed his duty to his master, then proceeds to prosecute some private purpose of his own, the master is not liable; but if the servant, while engaged about his master's business, merely deviates from the direct line of duty to accomplish some personal end, the master's responsibility may be suspended, but it is established when the servant resumes his duty. Even if in violation of expressed orders, a deviation from is not an abandonment of the master's service.
.....
... in cases where the servant has made a temporary departure from the service of the master, ... when the object of that departure has been accomplished, and the servant re-engages in the discharge of his duty (returning the truck to Louisiana as Roy Sanchez had been instructed to do), the responsibility of the master instantly attaches. Any other conclusion would leave us without any definite rule, in cases of temporary abandonment of duty, to determine when the servant re-entered the scope of his employment. (Emphasis ours).
This Court, in Walters v. Stonewall Cotton Mills, 136 Miss. 361, 101 So. 495 (1924), stated that:
In order to hold a master liable for the act of his servant, it is not necessary to show that the act in question was either expressly or impliedly authorized by the master. If the servant, at the time that the wrongful act was engaged for the master in a general scope of his employment, though acting contrary to the expressed instructions of the master, still the latter is liable. Or putting the same principle in another way, if the servant, when he committed the wrongful act, was acting in furtherance of the master's business for which he was employed, the master is liable, although the servant in the doing of the act has, contrary to the instructions of the master, stepped beyond his authority.
In Jenkins v. Cogan, 238 Miss. 543, 119 So.2d 363 (1960), this Court stated:
... The general rule is well recognized ... that where a servant commits a tortious act in furtherance of his master's business and within the real or apparent scope of his authority, the master becomes liable notwithstanding the fact that the act may not have been within the actual scope of the servant's employment.
Jenkins, supra, cited as authority 35 Am. Jur., Master and Servant, page 994, as follows:
... when it is asserted that the employee acted without the knowledge of the employer and without his approval, or in violation of his orders and instructions, the question of liability, as in other cases, is determined by whether the employee was in fact acting within the scope of his implied or apparent authority.
The above principles were further set out by this Court in Thrash v. Jackson Auto Sales, 232 Miss. 845, 100 So.2d 575 (1958), and Retail Credit Co. v. Coleman, 227 Miss. 791, 86 So.2d 666 (1956).
*1000 As stated at another point in this opinion, the law of agency as set out above was, of course, promulgated to protect employers from wrongful liability. I state without hesitation, however, that those principles of law and jurisprudence have also been promulgated in this jurisdiction, as well as others, for the purpose of protecting all the other users of the highway in addition to the employer's vehicle.
I reiterate that this Court should be extremely careful to find that the trial judges who hear these questions of fact and witness the participants in the trial be given their due respect regarding their findings. To do otherwise would weaken the court system greatly. Specifically, I cannot be a party to picking out certain parts of a record and using that and immaterial facts to justify stating that the lower court erroneously refused to reach a sound factual conclusion. I would affirm the cause.
PATTERSON, C.J., joins in this dissent.
LEE, Justice, dissenting:
I would affirm the judgment of the lower court, and, therefore, I respectfully dissent from the majority opinion.
The record reflects, and the trial judge found, that there were no restrictions previously imposed upon Sanchez that would prevent his having access to the Seedkem truck, provided that he ultimately took it to Lake Providence, Louisiana. No routes were designated for him to follow, he was not prohibited from stopping along the way, nor was his conduct outlined. Also, the trial judge found that Sanchez was en route to his Lake Providence home at the time of the collision. Under those facts and findings, and the authorities cited in the dissent by Mr. Justice Bowling, in my opinion, the judgment of the lower court should be affirmed.