**Rodney R. SMITH, Plaintiff,**

v.

**SEARS, ROEBUCK AND CO., Defendant.**

No. CIV. 3:01–CV–675LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

May 30, 2003.

Joseph Patrick Frascogna, Frascogna Courtney, PLLC, Jackson, MS, David A. Szwak, Bodenheimer, Jones, Szwak & Winchell, LLP, Shreveport, LA, for Plaintiff.

Lester F. Smith, Smith & Mcarty, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, Chief Judge.

This cause is before the court on the motion of defendant Sears, Roebuck and Company (Sears) to dismiss or, in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Rodney R. Smith has responded in opposition to the motion, and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, along with additional pertinent authorities, concludes that defendant's motion for summary judgment should be granted.

Rodney Smith brought this action against Sears in September 2001 seeking to recover damages for alleged violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681u (FCRA), based on the appearance on his consumer credit report of a number of inquiries by Sears into his credit report, all of which were made by Smith's ex-wife, a Sears employee, and all of which were impermissible inquiries under the FCRA. In addition to his claims under the FCRA, Smith has also asserted various state law claims, including for invasion of privacy and defamation. The facts giving rise to plaintiffs' claims are largely undisputed.

Rodney Smith married Ydona Smith in 1996. The couple had one child during their marriage and were divorced in 1998. Thereafter, in 1999, Ydona Smith went to work for Sears in its retail-debt collections department where her job entailed efforts to collect debts from existing Sears account-holders who were behind on their payments. In that capacity, and for that purpose, Ydona had access to a computer terminal and password that allowed her to use a Sears informational system that linked with a company known as First Pursuit, from which she could obtain certain information on customers from their credit reports.[1] In November 2000, Ydona was transferred to a position in which she worked with Sears' commercial-business customers, evidently performing a similar function.

During her tenure at Sears, Ydona was engaged in an effort to secure child support payments from her ex-husband, but both she and the State of Mississippi Department of Human Services were having difficulty locating Mr. Smith in order that he could be served with process. Mr. Smith, it seems, was an on-the-road truck driver who could never be found at the residence he claimed. Accordingly, in an attempt to find a current address on her former husband, Ydona, following her transfer in November 2000, used Sears' credit information system fourteen times over the span of approximately three months to access Mr. Smith's credit report. Although Ydona has testified that she was under the impression she was inquiring only into Smith's present address and employment and not as to his credit information, and has further stated that she never intended that the inquiries

---

1. Deposition testimony provided by various persons suggests that plaintiff performed skip tracing through First Pursuit, which had direct access to consumer credit reports from Trans Union. *See Slough v. F.T.C.*, 396 F.2d 870, 872 n. 2 (5th Cir.1968) (explaining that "[s]kip-tracing is the collection-agency practice of tracking down debtors whose whereabouts have become unknown."). In this manner, plaintiff was allowed at least limited access to a customer's credit report, or to portions of the customer's credit report.

would appear on his credit report, the First Pursuit program inexplicably placed all fourteen inquiries on Smith's consumer credit report. Upon discovering these inquiries, Smith contacted Sears to complain and, on October 18, 2001, based on her having violated Sears' policy in accessing Mr. Smith's credit report, Ydona was fired.

Sears maintains that it is entitled to dismissal and/or summary judgment on all of plaintiff's claims, and has advanced a number of arguments in support of its position as to each of the various claims. With reference, first, to his claims under the FCRA, Sears submits that although Ydona may have violated the terms of the Act, Sears has not violated the Act itself, and cannot be held vicariously liable for Ydona's violations. For the reasons that follow, the court agrees.

The Fair Credit Reporting Act, as amended in 1996, forbids any person from using or obtaining a consumer report for anything other than a permissible purpose, 15 U.S.C. § 1681b(f),[2] and specifically prohibits obtaining a consumer report under false pretenses or knowingly without a permissible purpose. Under the terms of the Act, any person[3] who negligently or willfully fails to comply with any requirement of the Act with respect to any consumer is liable to that consumer for actual damages, together with attorney's fees and costs, 15 U.S.C. § 1681n,[4] § 1681o[5]; and the violation is willful, punitive damages may also be imposed, 15 U.S.C. § 1681n.

**2.** 15 U.S.C. § 1681b(f) (2000) provides:

> A person shall not use or obtain a consumer report for any purpose unless—
> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
> (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

Section 1681b sets forth the purposes which are permissible. Suffice it to say that Ydona's purpose was not a permissible purpose and not one contends otherwise.

**3.** Under the FCRA, a "person" is defined broadly to include corporations. 15 U.S.C. § 1681a(b). *See also, infra,* n. 6

**4.** (a) In general

> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
> (1) (A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained

> by the consumer as a result of the failure or $1,000, whichever is greater;
> (2) such amount of punitive damages as the court may allow; and
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

**5.** Section 1681o, entitled "Civil liability for negligent noncompliance" states:

> (a) In general.
> Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
> (1) any actual damages sustained by the consumer as a result of the failure;
> (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.
> (b) Attorney's fees
> On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

In the case at bar, Sears does not deny that Ydona Smith's inquiries of her ex-husband's credit report were not for any of the purposes deemed permissible by the FCRA and that therefore, Ydona violated the Act. It submits, however, that it cannot be held vicariously liable for Ydona's violation of the Act.[6] It further contends that while an employer's negligence in allowing a violation to occur may perhaps warrant the imposition of liability against such employer, there is no evidence in the case at bar from which it might be concluded that Sears was negligent. Sears insists, therefore, that it is entitled to dismissal, or alternatively, summary judgment as to plaintiff's FCRA claims.

The FCRA does not directly address the issue of vicarious liability, and the question whether and/or under what circumstances an employer may be held vicariously liable for its employees' violations of the FCRA has not been previously addressed by this court or by the Fifth Circuit. Only a few courts, in fact, appear to have considered the issue. Of those, most have concluded that employers are vicariously liable for their employees' violations of the FCRA based on one or another common law agency principles, including the theory of "apparent authority," or something akin thereto. *See Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 964 (6th Cir.1998); *Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 972 (4th Cir.1987); *Myers v. Bennett Law Offices*, 238 F.Supp.2d 1196, 1201–02 (D.Nev.2002); *Del Amora v. Metro Ford Sales and Service, Inc.*, 206 F.Supp.2d 947, 952 (N.D.Ill.2002). That conclusion, however, has not been unanimous. *See Kodrick v. Ferguson*, 54 F.Supp.2d 788 (N.D.Ill.1999).

In the earliest of these cases, *Yohay v. City of Alexandria Employees Credit Union, Inc.*, Ryan, an attorney on retainer with the City of Alexandria Credit Union in connection with the collection of delinquent accounts, caused to be used the Credit Union's computer for her own personal purposes to obtain a consumer credit report on her ex-husband, Yohay, with whom she was engaged in a child custody battle. When he became aware that the Credit Union had obtained his credit report, Yohay made inquiry and learned that the report had been obtained at his ex-wife's request. Yohay sued the Credit Union alleging a willful violation of the FCRA and demanding an award of punitive damages; the Credit Union, in turn, sued Ryan for indemnification.

The court in *Yohay* determined, apparently on a variety of bases, that the Credit Union was liable for willfully violating the FCRA. The court first determined that both Ryan and the Credit Union were "users" of credit information under the FCRA, and held that "each of the two users ... is subject to civil liability under section 1681n if each user's individual noncompliance with section 1681b was willful." 827 F.2d at 972. The court then determined that there was "more than sufficient evidence" to support a finding that the Credit Union bad itself acted willfully. It noted, in particular, evidence that the manager of the Credit Union was friends with Ryan and her second husband, and that the manager had both known of Ryan's improper purpose in seeking her ex-husband's credit report and had directed an employee of the Credit Union to obtain the report for Ryan.

The court further held that Ryan was the Credit Union's agent and had apparent

---

**6.** The court notes that Smith has not filed suit against Ydona, but rather has chosen to bring his claims against Sears only.

authority, even if not actual authority, to obtain Yohay's credit report, and concluded that the Credit Union was therefore liable for Ryan's wrongful actions as its agent pursuant to the doctrine of *respondeat superior*. Respecting this issue, the court initially observed that "the Credit Union had posted no rules or guidelines concerning the running of credit checks and that seemingly anyone, who could obtain physical access to the computer on the Credit Union's premises, could access [the credit bureau's] files for any reason." *Id.* at 969.

> Seemingly, anyone who used the Credit Union's computer to access CBI's files appeared—from CBI's perspective—to have authority to gain such access. In that regard it is to be noted that the Credit Union had not posted any guidelines to users of the computer informing them of the circumstances under which such credit information could be obtained. Indeed, the Credit Union had posted the code which provided access to the computer system, enabling anyone with the physical opportunity to use the system to access CBI's files. The record also indicates that the credit check was run by Donna Hatton, an employee of the Credit Union, at the direction of George Filopovich, the manager of the Credit Union. There is little or no question about the apparent, if not the actual, authority of Filopovich to have ordered a credit check from CBI. Accordingly, the Credit Union would be liable to Yohay for Ryan's actions, regardless of whether Ryan had actual or apparent authority to obtain the information about Yohay from CBI.

*Id.* at 973.

In *Jones v. Federated Financial Reserve Corporation,* Jones' ex-husband, Lind, had a friend, Caylor, who worked as a debt collector for Federated, which had access to credit reporting agencies. Lind talked Caylor into getting Jones' credit report, which she did by filling out a request form and giving it to the clerks who operated Federated's credit report request system. Jones discovered that her credit report had been obtained, and sued Federated for negligent and willful violations of the FCRA. The determinative issue, the court decided, was whether the FCRA authorizes the imposition of liability on an employer under the common law doctrine of apparent authority. 144 F.3d at 961. In considering this question, the court observed that there are "three major types of agency liability," only one of which was potentially implicated:

> First, a principal may be vicariously liable for an agent's tortious conduct if the principal expressly or implicitly authorized the conduct. However, such liability is not applicable here, because it is not alleged that Federated expressly or implicitly authorized Caylor's conduct. Second, a principal may be vicariously liable for an agent's torts under a *respondeat superior* theory. Under a *respondeat superior* rule, a principal is only held vicariously liable for torts committed by an agent when the agent acts for the benefit of his principal within the scope of his employment.
>
> Third, a principal may be vicariously liable for an agent's tortious conduct based upon an apparent authority theory, if the principal cloaked its agent with apparent authority, i.e., held the agent out to third parties as possessing sufficient authority to commit the particular act in question, and there was reliance upon the apparent authority.

*Id.* (citations omitted). The court ultimately concluded that a principal may be liable for a violation of the FCRA by an agent under the theory of apparent authority, reasoning that this theory was compatible with the FCRA:

> In the absence of specific language regarding the imposition of vicarious liabil-

ity based on apparent authority, we must consider whether an apparent authority theory is consistent with Congress's intent behind the FCRA. Protecting consumers from the improper use of credit reports is an underlying policy of the FCRA. An apparent authority theory is in keeping with the FCRA's underlying deterrent purpose because employers are in a better position to protect consumers by use of internal safeguards. Because application of the apparent authority doctrine advances the FCRA's goals and produces no inconsistencies with other FCRA provisions, we conclude that such a theory of liability is an appropriately operative theory of liability under the statute.

Failure to impose vicarious liability on a corporation like Federated would allow it to escape liability for "willful" or "negligent" violations of the statute. Because a company like Federated can act only through its agents, it is difficult to imagine a situation in which a company would ever be found to have willfully violated the statute directly by obtaining a credit report for an impermissible purpose.[7] The FCRA's deterrence goal would be subverted if a corporation could escape liability for a violation that could only occur because the corporation cloaked its agent with the apparent authority to request credit reports.

*Id.* at 965–66.

In *Del Amora v. Metro Ford Sales and Service, Inc.,* the plaintiff's estranged wife's brother, Roman, was a salesman for a car dealership, Metro Ford, and in that capacity, was authorized to obtain credit reports on prospective buyers with their permission. For personal reasons relating to his sister's separation and having nothing to do with the business of the dealership, Roman obtained credit reports on Del Amora, who, when he learned of this, sued Metro Ford for willfully violating the FCRA. Turning to general rules of agency, as set forth in the Restatement of Agency, the court observed that an employer may be vicariously liable for the acts of its employees under one of two theories. First, under the *respondeat superior* doctrine, an employer is strictly liable for its employees' acts committed within the scope of employment; but since intentional torts do not generally fall within the scope of employment, that theory was deemed inapplicable to the situation. 206 F.Supp.2d at 952. Second, an employer may be subject to vicarious liability if the employee had apparent authority to act on behalf of the employer or was aided in accomplishing the wrongful act by the existence of the agency relation. *Id.* The court determined that the apparent agency theory was inapplicable, since the case involved a misuse of actual authority, as opposed to the exercise of authority the employee did not rightly have, *id.,* but it concluded that the aided-in-the-agency-relation doctrine applied to support the imposition of liability against Metro Ford, *id.* In support of this conclusion, the court reasoned:

> [I]t is undisputed that Roman was able to obtain Del Amora's credit report solely by virtue of his position with Metro Ford and his resultant access to Metro Ford's consumer reporting facilities. Metro Ford is in the best position to prevent future FCRA violations through employee training and screening programs and it is therefore liable for Roman's actions.

*Id.*

Finally, in *Myers v. Bennett Law Offices,* it was alleged that Barber, a parale-

---

7. Notably, although the *Jones* court cited *Yohay* elsewhere in its opinion, it failed to note that *Yohay* was illustrative of a situation in which the employer itself was found to have acted willfully in obtaining a credit report for what it knew was an improper purpose.

gal employed by Bennett Law Offices who regularly pulled credit reports on debtors as part of his employment duties, had requested credit reports on Samuel and Timothy Myers for his own personal reasons relating to a lawsuit he had filed against them for unlawful debt collection practices. The Myers sued Bennett Law Offices, alleging that it had violated the FCRA through Barber. The court, citing *Jones* with approval and without further ado, concluded that an "apparent authority theory would be consistent in 'keeping with the FCRA's underlying deterrent purpose because employers are in a better position to protect customers by use of internal safeguards." 238 F.Supp.2d at 1202 (quoting *Jones* ).

This court has considered the courts' reasoning in the cited cases, and in the end is not persuaded that it carries the day. With the exception of *Yohay,* in which the court, although espousing apparent agency as a basis for the employer's liability, actually appeared to impose liability based on the employer's complicity in the violation (both by causing the particular violation and failing to take reasonable steps to prevent violations), these courts have, in effect, imposed strict liability against employers for intentional wrongs committed by their employees for the employees' own personal purposes. Based on the rationale employed by the courts in these cases, despite an employer's best efforts to ensure compliance with the FCRA, that employer is subject to liability for the actions of any rogue employee who might manage to obtain a credit report for his own personal reasons—which is to say, short of implementing foolproof compliance procedures, there is nothing an employer can do to avoid liability.

The principal (or in some cases sole) justification offered in support of the conclusion that employers ought be held accountable in this manner for the actions of their employees, irrespective of the employers' own efforts to prevent FCRA violations by their employees, has been that "imposing vicarious liability under the FCRA is consistent with Congress's intent to protect consumers from improper use of credit reports and to deter statutory violations," *Del Amora,* 206 F.Supp.2d at 950, and that "employers are in a better position to protect customers by the use of internal safeguards," *Jones,* 144 F.3d at 965–66. Yet with respect to *consumer reporting agencies,* on which the FCRA places primary responsibility for ensuring the sanctity of credit reports, the FCRA plainly does not impose any form of strict liability, but rather imposes liability only for negligent noncompliance with the Act and allows for enhanced penalties for willful violations. *See* 15 U.S.C. §§ 1681n, 1681o. This court can fathom no reason why users such as Sears should be held to a higher standard in the name of consumer protection than the consumer reporting agencies themselves.

■ This was the point, in part, of the court's opinion in *Kodrick v. Ferguson,* 54 F.Supp.2d 788 (N.D.Ill.1999). There, the court held that Accubanc Mortgage could not be held liable under the FCRA for the actions of one of its senior loan officers, Cheryl Ferguson, in obtaining a credit report on her ex–husband's new wife, Kodrick, for Ferguson's own personal reasons and without Accubanc's knowledge or consent. The court declined to follow the lead of *Jones* and infer that "the FCRA imposes strict liability on subscribers when an employee obtains a report for personal use by falsely certifying a permissible purpose." *Id.* at 794. Rather, the court interpreted "the text and structure of the FCRA" to "indicate that Congress carefully located the penalty for impermissible use—and thus the duty to prevent it—with the industry players best able to correct the systemic problems: consumer reporting agencies and individuals who knowing-

ly violate the law." *Id.* The court explained,

> The text, stated purpose, structure, and legislative history all suggest that Congress wanted to place the responsibility for breaches of confidentiality primarily on the credit reporting agencies. Even there, they did not provide strict liability for all violations. Although we agree in theory with the *Jones* court that the "aided in the agency relation" rule could be useful in this context where an employee's authorization to obtain credit reports facilitates an invasion of a consumer's privacy, we do not believe the statute allows us to overlay this theory of vicarious liability. There is not silence on agency altogether; the silence here is in the form of an absence of an affirmative duty imposed on employers of rogue "users."

*Id.* at 794–95. The *Kodrick* court observed at the outset that the FCRA, by its terms, is "designed to 'insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy'," *id.* at 789 (quoting 15 U.S.C. § 1681(a)), and that the Act's stated purpose is to

> "require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."

*Id.* (quoting 15 U.S.C. § 1681(b)). Thus, the goal of the Act, the court noted, "is to get *credit reporting agencies* to adopt rea-

sonable procedures." *Id.* at 795 n. 6. The court proceeded to thoroughly analyze the relevant text and scheme of the FCRA, including in particular those provisions setting forth the duties of "consumer reporting agencies" to "maintain reasonable procedures" designed to avoid violations of the Act, (and noted, as well, the corresponding omission of other than limited duties imposed on users or subscribers), and concluded that the "scheme does not impose strict liability on subscribers." *Id.* at 796. The court aptly observed,

> Were we to infer strict liability we would be imposing a greater burden on subscribers than that which the statute explicitly imposes on [credit reporting agencies].

*Id.* at 796 n. 10. The court thus held that "a subscriber is not liable under § 1681n or § 1681o for its employee's unauthorized willful violations of the [FCRA], where the employee of the subscriber obtained the report under false pretenses and for personal use without the express or implied approval of her supervisors." *Id.* at 798.

This court would not deny that imposing vicarious liability under the FCRA might be "consistent with Congress's intent to protect consumers from improper use of credit reports and to deter statutory violations." *Del Amora*, 206 F.Supp.2d at 950. But as the court in *Kodrick* recognized, the effective imposition of strict liability against employers, who are in no better position than credit reporting agencies, and who have no greater duty under the terms of the Act to "protect customers by the use of internal safeguards," *Jones*, 144 F.3d ·at 965–66, cannot fairly be subjected to greater liability—or a lesser standard of liability—than the credit reporting agencies.[8]

---

8. Though obviously of no precedential value, the court finds the comments of one writer insightful. In his article, "Vicarious Liability under the FCRA," *Priv. And Information Law* *Report* (Sept.2002), L. Richard Fischer wrote the following:

That brings the court to the question whether plaintiff in this case has stated, and if so, whether he has created a triable issue with respect to his claim against Sears directly, rather than vicariously, for Sears' alleged negligence or recklessness in failing to prevent Ydona's violations of the FCRA.[9] In this regard, plaintiff alleges in his complaint that Sears "negligently entrusted and provided a credit reporting direct access terminal to certain employees who used the device to harm Plaintiff and commit illegal acts," and that Sears "failed to employ adequate and necessary procedures to avoid violations of the FCRA."[10]

Plaintiff has not identified any provision of the FCRA which imposes on a user or subscriber such as Sears a duty to employ adequate and necessary procedures to prevent FCRA violations by its employees, and for its part, the court has uncovered no such provision nor any case which has concluded that such an affirmative duty exists. In *Kodrick*, 54 F.Supp.2d at 796, the court concluded that Congress did not intend "us to infer from § 1681b(f) that

subscribers have a duty to prevent willful violations, given that it has expressly placed that responsibility with the credit agencies". *See also Wiggins v. District Cablevision, Inc.*, 853 F.Supp. 484, 491 (D.D.C.1994) (concluding that 15 U.S.C. § 1681m(c), which provides that "[n]o person shall be held liable for any violation of this section if he shows ... that ... he maintained reasonable procedures to assure compliance with the provisions of this section," did not impose an affirmative requirement on a user to maintain such reasonable procedures on pain of civil liability); *cf. Myers*, 238 F.Supp.2d at 1203 (declining to answer question whether the FCRA places a duty on employers to institute policies to ensure their employees comply with the FCRA since plaintiffs had failed to assert the necessary evidence to conclude that a jury could reasonably find in their favor with respect to a negligence claim). Nevertheless, a number of courts, including *Yohay, Del Amora*, and even *Kodrick*, have suggested that there are circumstances in which an employer may, and should be held liable for failing to prevent violations by its employees. *See*

[Under the logic of *Jones* ], Section 607 of the FCRA, which requires consumer reporting agencies to maintain reasonable procedures to avoid violations and to limit the furnishing of consumer reports to permissible purposes, would be unnecessary. In its place, Congress would have imposed a strict liability standard, since consumer reporting agencies clearly are "in a better position to protect consumers by use of internal safeguards." Instead, Congress established negligent and willful standards for liability under the FCRA, not strict liability. And, just as it is impossible to stop a rogue employee at a consumer reporting agency from providing a consumer report for an impermissible personal purpose, it is impossible to stop a rogue employee at a user company from obtaining a consumer report for impermissible personal purposes.

As a result, courts should review the actions of the employer, not the rogue employee, when reaching decisions regarding

liability under the FCRA. Where the employer's actions are negligent or willful, as in *Yohay* would suggest, then liability could follow. On the other hand, no section of the FCRA imposes strict liability on consumer reporting agencies or on users of consumer reports, and courts should avoid employing the type of social engineering found in the *Jones* and *Del Amora* decisions in a misguided effort to find one.

9. The court notes that there is no allegation nor any proof that Sears expressly or implicitly authorized the conduct in question. Indeed, it is undisputed that Sears was unaware of Ydona's activities until brought to its attention by Smith after the fact.

10. It is unclear whether plaintiff's negligence claim is sought to be asserted under the FCRA or state law. In either case, the court concludes that he has failed to create a triable issue on the claim.

612

*Del Amora,* 206 F.Supp.2d at 953 (stating that "[t]o hold Metro Ford directly liable for the [employee's] willful violation of the FCRA, Del Amora must demonstrate that ... Metro Ford was negligent or reckless in allowing the misconduct to occur"); *see also Yohay,* 827 F.2d at 973 (finding liability because, *inter alia,* the employer subscriber had posted no rules or guidelines concerning the running of credit checks and that anyone who could obtain physical access to its computer could access [the credit bureau's] files for any reason); *Kodrick,* 54 F.Supp.2d 788 (suggesting that liability might be in order where the subscriber recklessly gives access to its credit bureau facilities to employees who would not need such access to carry out the work within their job description); *cf. Myers,* 238 F.Supp.2d at 1204 obviously, (suggesting that if liability were to be imposed under FCRA for failing to prevent employee's violations, proof would be required of "a policy so negligent or reckless that it would 'almost invite violations.' ") (citing *Kodrick* ).

Regardless of whether an affirmative duty on the part of subscribers or users to adopt reasonable procedures to prevent FCRA violations can be found within the scheme established by the Act, there can be little doubt that such a duty would be "consistent with Congress's intent behind the FCRA" of protecting consumers from the improper use of credit reports. And it is certainly a less onerous standard on which to base liability than the effective strict liability imposed in cases such as *Jones* and those following *Jones's* lead. The court, however, need not decide the question whether liability may properly arise under the FCRA (or under state law, for that matter) on the basis of a failure to adopt and utilize measures reasonably designed to prevent violations, or whether, perhaps, an employer's reckless failure to prevent violations would be actionable, for in the case at bar, the court, having re-

viewed the evidence of record, is of the opinion that plaintiff has failed to present evidence tending to show that Sears was negligent (or was reckless) in enacting (or failing to enact) procedures designed to prevent its employees from violating the FCRA, or that it was otherwise negligent.

In this regard, the record establishes that upon her hiring, Ydona was given a user ID that allowed her to access, via First Pursuit, information from credit reports which she needed to fulfill her job duties. She also was provided personal training relating directly to the permissible uses of that skip tracing program which she ultimately used to gain access to plaintiff's credit report. Ydona was expressly instructed in the course of her training that she was only authorized to retrieve information on existing Sears customers and for proper purposes, and was given copies of the Sears rules and guidelines which informed her that she was forbidden to pull credit information on any person other than Sears account holders. These documents which Ydona signed expressly advised that the use of Sears' computer resources for anything other than a company business purpose was a terminable offense and it is undisputed that Ydonna knew that accessing her ex-husband's credit report was contrary to her personal training at Sears as well as Sears' company policy regarding the use of these types of information systems.

Plaintiff argues in his response memorandum that once Ydona transferred to commercial-business accounts, "Ydona was not able to access credit reporting information software through the Sears system due to restrictions placed on her password and access code," from which he concludes that "another Sears employee, perhaps someone in the consumer credit side of the business," must have "assisted Ydona in accessing the plaintiff's credit reports."

Plaintiff's argument on this issue does nothing toward showing that Sears' policies were inadequate or that Sears was otherwise negligent or reckless. First, and most obviously, there is no evidentiary support for plaintiff's argument in this regard, so his conclusion as to how Ydona managed to access his account amounts to nothing more than speculation.[11] But even were there proof to support his hypothesis as to the method of Ydona's violation, that still would not support a finding of any actionable omission by Sears. That is, even assuming that Ydona did not access Smith's credit reports herself, but got someone else to do it for her, there is nothing to indicate that this did, or might have occurred because Sears failed to take reasonable steps to, or was somehow reckless in failing to, restrict access to credit reports to proper persons for proper purposes.

In sum, plaintiff has failed to present evidence to demonstrate that Sears was negligent, and certainly there is no evidence that any policy, act or omission by Sears respecting the use of its facilities for accessing credit information was so negligent or reckless as to "almost invite violations." Accordingly, even assuming that such conduct might be actionable, the failure of proof dooms any such claim.

■ In addition to his claims under the FCRA, plaintiff has evidently undertaken to plead state law claims for defamation, invasion of privacy and intentional infliction of emotional distress. Although defendant has asserted various grounds on which it maintains dismissal and/or summary judgment should be granted as to these claims, the court need address only one, and that is Sears' contention that it is not vicariously liable under state law for Ydona's intentional torts. In *Bussen v. South Central Bell Telephone Company*, 682 F.Supp. 319, 325 (S.D.Miss.1987), Judge Barbour entered judgment for South Central Bell on the plaintiff's claim for invasion of privacy based on the company's employee having accessed the plaintiff's billing records, finding that South Central Bell had no liability for the employee's actions. He stated:

[E]ven if Pat Carrol's actions did constitute an invasion upon the plaintiff's privacy, the Court is also of the opinion that no liability would attach to South Central Bell. The law is well settled in Mississippi that a master is liable for the acts of a servant when they are done "in the furtherance of his employer's business, and within the real or apparent scope of his employment." *Marter v. Scott, et al.*, 514 So.2d 1240, 1242 (Miss. 1987). *See also Odier v. Sumrall*, 353 So.2d 1370 (Miss.1978); *Thomas–Kincannon–Elkin Drug Co., Inc. v. Hendrix*, [175 Miss. 767,] 168 So. 287 (Miss. 1936).

Pat Carrol was neither authorized to access the plaintiff's billing or toll records nor empowered to divulge such information. Pat Carrol had stepped aside from her master's work. *Seedkem South Inc. v. Lee*, 391 So.2d 990, 995 (Miss.1980) (citing *International Shoe Co. v. Harrison*, 63 So.2d 837, 217 Miss. 152 (1953)). She had departed from her employer's business for purposes of her own. *Id.*

**11.** Ydona testified that she accessed the reports herself via the First Pursuit skip trace program used by Sears. She stated that she was not given access to credit reporting terminals but did not need such access to use the First Pursuit program. The fact that the First Pursuit program posted the complained-of inquiries is supported by the uncontradicted testimony of Eileen Little, consumer relations group manager at Trans Union, and Smith has presented no evidence—only his suspicion—that an employee other than Ydona was involved in the impermissible inquiries.

614

*Id.* at 325. This analysis applies with equal force to plaintiff's state law claims in the case at bar for invasion of privacy, defamation and intentional infliction of emotional distress, as to which claims summary judgment is therefore in order.[12]

For the foregoing reasons, it is ordered that Sears' motion for summary judgment is granted.

A separate judgment will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

12. Given the court's conclusion in this regard, it is unnecessary to consider Sears' additional arguments relating to, *inter alia,* FCRA preemption and qualified immunity.